1

2

3

4                                 UNITED STATES DISTRICT COURT

5                              NORTHERN DISTRICT OF CALIFORNIA

6

7       A.S.,                                          Case No.  20-cv-00281-JCS

8                          Plaintiff,

9                 v.                                    **ORDER RE CROSS MOTIONS FOR
                                                        SUMMARY JUDGMENT**
10      ANDREW SAUL,                                    Re: Dkt. Nos. 20, 23

11                         Defendant.

12      **I.      INTRODUCTION**

13              Plaintiff A.S.[1] brings this action challenging the final decision of Defendant Andrew Saul,

14      Commissioner of Social Security (the "Commissioner") denying A.S.'s application for disability

15      benefits.  The parties filed cross motions for summary judgment pursuant to Civil Local Rule

16      16-5.  For the reasons discussed below, A.S.'s motion is GRANTED, the Commissioner's motion

17      is DENIED, and the matter is REMANDED for further administrative proceedings consistent with

18      this order.[2]

19      **II.     BACKGROUND**

20              **A.      Education and Employment History**

21              A.S. was born on April 16, 1990.  Administrative Record ("AR," dkt. 15) at 1370–71.  She

22      graduated from the Independent Study Program at Berkeley High School with the support of an

23      individualized education plan.  *Id.* at 540–614.  A.S. worked at MAC Cosmetics in 2012,

24      Columbia Sportswear from September to December 2013, Whole Foods from October 2014 to

25

26      _____

27      [1] Because opinions by the Court are more widely available than other filings, and this order
        contains potentially sensitive medical information, this order refers to the plaintiff only by her
        initials.  This order does not alter the degree of public access to other filings in this action
28      provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule
        5-1(c)(5)(B)(i).
        [2] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to
        28 U.S.C. § 636(c).

United States District Court
Northern District of California

September 2015, and Berkeley Bowl Produce in the fourth quarter of 2015. *Id.* at 27, 536. A.S. worked a number of "temporary odd jobs" in 2016 and 2017. *Id.* She worked at Orton Entertainment from March to May 2018 and Sonic Holdings from June to October 2018. *Id.* A.S. testified at the December 4, 2018 hearing that she had been working at Craft Cannabis for "[a]bout 30 days." *Id.* at 27–28, 84–85.

## B.   Medical History

This summary focuses on the evidence cited by the parties and relevant to the resolution of the present motions and is not intended as a complete recitation of the administrative record or A.S.'s medical history.[3] A.S. alleges disability based both on mental impairments, including bipolar disorder, and based on physical impairments caused by a workplace injury.

### 1.   Mental Impairments

In 2004, when A.S. was fourteen years old, she was referred for psychological testing at West Coast Children's Clinic by her adoptive parents and her therapist over concerns about her difficulties with interpersonal relationships, self-mutilating behavior, and compulsive eating. *Id.* at 974–87, 989.

In 2005, medical records indicate that A.S. felt depressed and had a history of suicidal ideation. *Id.* at 1464. Records also noted that A.S. was taking prescription medication, specifically Prozac for suicidal ideations, *id.* at 1454, and Depakote for bipolar disorder, *id.* at 1464. In 2006, medical records at the Teen Clinic at Children's Hospital Oakland noted that A.S. had an "elevated mood, continue[d] to display manic behavior," and was obese. *Id.* at 1465.

In a discharge summary from West Coast Children's Clinic in July of 2007, Dr. Barbara E. Nova, M.D., noted A.S.'s diagnoses were Bipolar II Disorder, Eating Disorder, and Obesity. *Id.* at 1004. Dr. Nova recommended "continued outpatient individual therapy for [A.S.] to help her manage her mood swings, interpersonal difficulties, and impulsivity." *Id.* at 1003. Dr. Nova also

---

[3] Pursuant to Civil Local Rule 56-2, this Court ordered both parties to "file either a joint statement or separate statements of the Administrative Record." Order (dkt. 9) at 1. The Commissioner failed to provide a separate statement of the Administrative Record, and his motion includes no citation to the medical evidence. *See generally* Comm'r's Mot. (dkt. 23). The Commissioner is admonished to comply with the Court's orders and to cite relevant evidence in future cases.

United States District Court
Northern District of California

1    noted that A.S. had been prescribed Depakote for bipolar disorder but did not consistently take it.

2    *Id.* at 1002.

3          In 2008, A.S. reported "poor compliance" with taking Depakote and explained that she did

4    "not like taking pills." *Id.* at 1512 (internal quotation marks omitted).  In September of 2008,

5    police took A.S. to John George Psychiatric Pavilion after she expressed suicidal ideations.  *Id.* at

6    1006–21. At John George, she was assessed "dangerous to self" and diagnosed with Adjustment

7    Disorder with Mixed Disturbance of Emotion and Conduct and Mood Disorder.  *Id.* at 1007.  She

8    reported that she had "recently [been] taken off [D]epakote a week ago." *Id.* at 1006.

9          On April 23, 2009, A.S. sought medication at Pathways to Wellness Medication Clinic

10   where she was diagnosed with Bipolar II Disorder, Borderline Personality, and Obesity, and

11   prescribed Depakote.  *Id.* at 1023–24.  The treating physician assessed mild restrictions in daily

12   activities, no difficulties in maintaining social functioning and relationships, moderate difficulty in

13   maintaining concentration, and mild episodes of decomposition.  *Id.* at 1030.  Medical notes

14   indicated A.S. was suffering from depression, psychomotor agitation, and elevated hypomania,

15   and was hyperverbal, distractible, and hyperactive.  *Id.* at 1031.

16         On June 21, 2010, medical records from a clinic visit noted that A.S. was obese and

17   suffered from Bipolar Disorder and Depression.  *Id.* at 1062.  Records further noted that A.S. was

18   depressed about her weight and had missed twenty-five weeks of work.  *Id.*  On November 27,

19   2010, A.S. sought medication at Sausal Creek Outpatient Clinic where she was diagnosed with

20   Bipolar II Disorder and Obesity, and prescribed Abilify for depression and Trazadone for

21   insomnia.  *Id.* at 1036–38.  Medical records note that A.S. reported depressive and manic episodes,

22   and "endorse[d] frequent crying spells, insomnia, irritable mood, [and] self medicat[ion] (alcohol)

23   when depressed." *Id.*  A.S. also reported "be[ing] off psychotropic med[ications]" for

24   approximately two years but wanted to begin using them again.  *Id.* at 1038.

25                        a.    Shefali Miller, Ph.D.

26         On April 9, 2014, Dr. Shefali Miller, Ph.D., conducted a psychological evaluation of A.S.

27   and diagnosed Bipolar I Disorder.  *Id.* at 1177.  A.S. reported feeling manic for seven months,

28   from February to August of 2013, and at the time of the evaluation had decreased appetite,

1  decreased sleep, and increased energy.  *Id.*  Dr. Miller noted that A.S. presented with "possible

2  grandiose delusions" after she described feeling "invincible" and "God-like" when manic.  *Id.*  Dr.

3  Miller further noted that A.S. presented as "suicidal/homicidal" although she had no plan to harm

4  herself or another person.  *Id.*  Lastly, Dr. Miller noted that A.S. was suffering from panic attacks

5  and anxiety which caused her to smoke marijuana.  *Id.* at 1181.

6  

b.     Bob Kennedy, Psy.D.

7        On April 21, 2014, Dr. Bob Kennedy, Psy.D., from the Alameda County Social Services

8  Agency conducted a psychological evaluation and diagnosed A.S. as "Bipolar Depressed w[ith]

9  Delusions (Grandeur)" and PTSD.  *Id.* at 1186.  Dr. Kennedy marked that A.S.'s "mental health

10  conditions prevent [her] from working" and noted that A.S. was homeless.  *Id.* at 1186.

11  

c.     Kyle Van Gaasbeek, Psy.D.

12        On June 30, 2014, consultative examiner Dr. Kyle Van Gaasbeek, Psy.D., evaluated A.S.

13  in conjunction with her application for Social Security disability benefits and diagnosed Bipolar II

14  Disorder, Obesity, and homelessness.  *Id.* at 1201.  Dr. Van Gaasbeek noted that although A.S.'s

15  diagnoses were treatable and her symptoms might improve with medication, it was "unlikely that

16  she w[ould] ever recover."  *Id.* at 1202.  Dr. Van Gaasbeek assessed impairments in A.S.'s ability

17  to interact with her coworkers and the public, to maintain regular attendance in the workplace, and

18  to deal with the usual workplace stressors.  *Id.*  Dr. Van Gaasbeek noted, however, that A.S. was

19  not impaired in performing simple and repetitive tasks, accepting instructions from supervisors,

20  and consistently performing work activities without special or additional instruction.  *Id.*

21  

d.     Leslie Franklin, Ph.D.

22        From March to July 2014, A.S. attended nine weekly therapy sessions with Dr. Leslie

23  Franklin, Ph.D., and Marisol Reyna.  *Id.* at 1205–08.  During the sessions, A.S. reported struggling

24  with suicidal thoughts.  *Id.* at 1230, 1232, 1234, 1236.  On July 14, 2014, Dr. Franklin completed a

25  Mental Impairment Questionnaire.  *Id.* at 1205.  Dr. Franklin reported "extreme" restrictions in

26  daily life, "extreme" difficulties in social functioning, and "marked" difficulties in concentration,

27  persistence, or pace, and noted that her impairments had existed since childhood.  *Id.* at 1206–07.

28  Dr. Franklin assessed that A.S.'s impairments would cause her to be absent from work "[m]ore

4

United States District Court
Northern District of California

1   than 4 days per month." *Id.* Dr. Franklin further assessed that A.S.'s alcohol and substance abuse

2   contribute to her impairments by impacting her memory and indicated her belief that A.S. would

3   reduce or cease her substance use once she was on prescription medication. *Id.* at 1207–08.

4                 e.    Tawnya Brode, Psy.D.; Joan L. Bradus, M.D.; and Psychological
5                      Medical Consultant V. Lucila, M.D.

6        In July of 2014, Dr. Tawnya Brode, Psy.D., reviewed A.S.'s treatment records but did not

7   treat A.S. *Id.* at 152. Dr. Brode assessed "severe" Affective Disorder and "severe" Personality

8   Disorder, *id.*, and noted a Residual Functional Capacity for limited public contact and simple

9   repetitive tasks, *id.* at 158. In October of 2014, Dr. Joan L, Bradus, M.D., and Psychological

10  Medical Consultant Dr. V. Lucila, M.D., affirmed Dr. Brode's opinion after reviewing additional

11  medical records, including the psychological evaluation by Dr. Franklin. *Id.* at 188–93.

12                f.    Emma Neumann, MFT

13       On August 9, 2015, A.S. had one therapy session with Emma Neumann, MFT, at

14  Multilingual Counseling and discussed "possible ways to cope with feelings of irritability and

15  impulsive behaviors at work." *Id.* at 1339. She reported wanting to take medication and

16  expressed concerns about returning to work. *Id.*

17                g.    Kevin White, M.D.

18       On August 15, 2015, A.S. had an initial evaluation with Dr. Kevin White, M.D., to treat

19  her mood disorder. *Id.* at 1341. Dr. White documented irritability and impulsivity, *id.*, and

20  diagnosed mild Bipolar I Disorder and PTSD, *id.* at 1344. Dr. White noted that A.S. was using

21  marijuana daily. *Id.* at 1342. The record includes multiple doctors' recommendations that A.S.

22  received for medical marijuana. *Id.* at 1345–46.

23                h.    Kari Petersen, LCSW

24       On April 27, 2016, A.S. began psychotherapy with Kari Petersen, LCSW, at Lifelong

25  Medical Care to "learn[] new skills to keep from 'having the floor fall out from under her' all the

26  time." *Id.* at 1370. She attended weekly psychotherapy sessions until July 2016. *Id.* at 1435.

27  LCSW Petersen diagnosed Bipolar I Disorder and noted that A.S. was self-medicating with

28  marijuana. *Id.* at 1372. LCSW Petersen assessed that A.S. has "always been able to get jobs," but

United States District Court
Northern District of California

5

1    then becomes reactive and loses those jobs. *Id.* at 1373. LCSW Petersen established a weekly

2    plan with A.S. to "work on identifying triggers to reactive outbursts that cause her to lose friends

3    and jobs." *Id.*

4         After three psychotherapy sessions, LCSW Peterson documented in a June 1, 2016 letter a

5    diagnosis of Bipolar I Disorder, Intermittent Explosive Disorder, and co-occurring Marijuana Use

6    Disorder. *Id.* at 1347. A.S. reported to LCSW Peterson her inability to maintain relationships

7    with coworkers and the angry outbursts that result from the souring of those relationships, which

8    LCSW Peterson attributed to childhood abuse and neglect. *Id.* LCSW Peterson wrote that the co-

9    occurring Marijuana Use Disorder was "neither cause nor contributing factor to Bipolar Disorder I

10   or to Intermittent Explosive Disorder" because her mental diagnoses preceded her drug use. *Id.*

11   LCSW Peterson concluded that A.S. needed both treatment and medication, but "the length of

12   such treatment would vary and may need to proceed for 2 or more years for substantial recovery to

13   be effected." *Id.*

14        On July 28, 2016, LCSW Peterson noted that A.S. was engaging in weekly psychotherapy

15   sessions until she learned that LCSW Peterson was leaving the clinic and "became angry and left."

16   *Id.* at 1435. In a Mental Impairment Questionnaire, LCSW Peterson diagnosed Borderline

17   Personality Disorder and assessed emotional withdrawal and isolation. *Id.* She further assessed

18   deeply ingrained patterns of "[i]ntense and unstable interpersonal relationships and impulsive and

19   damaging behavior" and "[p]ersistent disturbances of mood or affect." *Id.* She noted mood

20   disturbances and "[e]motional lability (e.g., explosive temper outbursts, sudden crying, etc.) and

21   impairment in impulse control." *Id.* In her evaluation of A.S.'s impairments, LCSW Peterson

22   checked boxes indicating extreme limitations in accepting instructions and criticism from

23   supervisors, as well as extreme limitations in working with co-workers without "exhibiting

24   behavioral extremes." *Id.* at 1438. In an explanatory note, LCSW Peterson wrote that A.S. had at

25   times been reactive with clinic staff without clear reasons. *Id.* LCSW Peterson further noted

26   marked limitations in maintaining social functioning. *Id.* at 1439.

27        Ultimately, LCSW Peterson concluded that A.S. would be absent from work "about 3 days

28   per month" and would be off task twenty percent of the time. *Id.* at 1440. She assessed that A.S.

6

1  would have difficulty sustaining a regular job because she is "unable to manage her impulse to

2  lash out at others who may be critical or who she perceives as rejecting" her.  *Id.*  Lastly, LCSW

3  Peterson again concluded that even if A.S. stopped using drugs or alcohol, her mental impairments

4  would still be disabling because her behavioral issues preceded her drug use.  *Id.*

5                                  i.        Katherine Wiebe, Ph.D.

6          On March 28, 2016, Dr. Katherine Wiebe, Ph.D., conducted a 1.75-hour psychological

7  evaluation of A.S. upon referral by counsel.  *Id.* at 1349.  Dr. Wiebe diagnosed Unspecified

8  Bipolar and Related Disorder, Generalized Anxiety Disorder, Borderline Personality Disorder

9  with Depressive Personality Traits, Self-Defeating Personality Traits, and Antisocial Personality

10  Traits.  *Id.* at 1362.  Dr. Wiebe noted that A.S.'s "severe psychiatric problems began when she was

11  abused in her childhood prior to any use of substances," and that she "currently uses medical

12  marijuana daily for back pain, anxiety and insomnia."  *Id.*  Dr. Wiebe assessed marked limitations

13  in A.S.'s ability to accept instructions and respond appropriately to criticism from supervisors, to

14  respond appropriately to changes in a routine work setting and normal work stressors, to complete

15  a normal workday or workweek without interruption from her psychologically based symptoms,

16  and to maintain regular attendance and punctuality.  *Id.*

17                                  j.        Roslyn Wright, Psy.D.

18          On October 17, 2018, Dr. Roslyn Wright, Psy.D., conducted a psychological evaluation in

19  connection with A.S.'s application for Social Security benefits.  *Id.* at 1803.  Dr. Wright diagnosed

20  Bipolar II Disorder and Borderline Personality Disorder.  *Id.* at 1815.  Dr. Wright assessed that

21  A.S.'s problems controlling her behavior and impulsivity impair her ability to follow instructions

22  such that she is "likely to be 'off task' at least 20% of the time."  *Id.*  Her mood instability and

23  impulsive behavior impair her ability to follow a routine, and she would likely "miss more than 5

24  days of work each month."  *Id.* at 1816.  Dr. Wright noted that A.S. is "unable to overcome even

25  minor obstacles and cannot resolve even mild interpersonal conflicts."  *Id.*  Dr. Wright assessed

26  that A.S.'s mental health impairments are not caused by her use of marijuana or any other

27  substances:

28

United States District Court
Northern District of California

7

1

2

3

> There is no indication that the impairments and limitations described herein are being caused or exacerbated by substance abuse. While she acknowledges using medical marijuana, there is no indication that [A.S.] uses or abuses any other psychoactive substances, nor is there any evidence that her functioning deteriorates in response to her use of cannabis.

4   *Id.*  Dr. Wright concluded that A.S.'s mental health impairments are severe and "indicative of a

5   poor prognosis." *Id.*  Dr. Wright wrote that "[d]espite receiving psychological and psychiatric

6   treatment from a variety of competent professionals, her symptoms have impaired her academic,

7   occupational, and interpersonal functioning, jeopardize her physical health, and interfere with her

8   ability to meet her own basic needs for food, clothing, and shelter." *Id.*

9                    **2.       Physical Impairments**

10          On November 28, 2015, A.S. suffered a work-related injury when she fell in the freezer at

11   Berkeley Bowl.  *Id.* at 1400.  She reported falling on her back and hitting her head on a metal cart.

12   *Id.* at 1428.  She began attending monthly appointments at U.S. Healthworks from December 2015

13   to January 2016 and March to July 2016.  *Id.* at 1423, 1694.  On December 1, 2015, A.S. reported

14   soreness and pain in her lower and middle back and rated the severity of the pain as "7 out of 10."

15   *Id.* at 1428.  On January 21, 2016, A.S. reported dull pain radiating down her right leg and

16   complained of limited back motion.  *Id.* at 1423.  She was prescribed Baclofen (a muscle relaxer)

17   and a TENS machine for thoracic strain, lumbar strain, and blunt head force trauma.  *Id.* at 1425.

18   A March 16, 2016 MRI showed "L5-S1 with a 4 mm broad-based central to right paracentral disc

19   protrusion with moderate right foraminal stenosis." *Id.*  Dr. Ronald White, M.D., reviewed her

20   medical history, her physical examination, and the MRI and concluded that A.S. "sustain[ed] an

21   injury to lumbar spine arising out of and caused by the industrial exposure of 11/28/2015." *Id.* at

22   1409.  Dr. Ronald White recommended a sit-down job, limited standing and walking, limited

23   stooping and bending, and limited lifting, pulling, and pushing of no more than ten pounds.  *Id.* at

24   1411.  Dr. White further noted that A.S. "must wear back support." *Id.*

25          In March of 2016, A.S. began receiving primary care from Kevin Lagor, N.P., at Lifelong

26   Medical Care for low back pain, *id.* at 1366, weight management and diabetes prevention, *id.* at

27   1375, and right foot pain, *id.* at 1381.  A.S. reported compulsive eating and daily marijuana usage

28   to help manage her anxiety.  *Id.* at 1366.  When describing her daily activities, A.S. reported

United States District Court
Northern District of California

8

cooking for clients as a personal chef but "[o]therwise at home [in] bed and high all day." *Id.* at 1367.   In April of 2016, NP Lagor diagnosed "[n]on morbid obesity" and recommended an app to track her food consumption and exercise. *Id.* at 1376.  In May of 2016, NP Lagor noted A.S.'s complaints of "aching and burning" pain on her right foot twice a week which was "suggestive of plantar fasciitis." *Id.* at 1383.  He prescribed Tylenol to treat the pain and inflammation. *Id.*  NP Lagor noted that A.S. was also working with US Healthworks for Workers' Compensation and receiving physical therapy with a TENS machine. *Id.* at 1366.

On June 9, 2016, Dr. Sonia Bell, M.D., examined A.S. and approved six additional sessions of physical therapy and an epidural. *Id.* at 1392.  On June 28, 2016, Dr. Bell noted that A.S. must take a stretch break every thirty minutes.[4] *Id.* at 1434.  Dr. Bell further noted that A.S. must alternate between sitting and standing. *Id.*

On February 9, 2017, Dr. Diokson Rena, M.D., diagnosed lumbar disc displacement and chronic lumbar strain. *Id.* at 1674.  Dr. Rena concluded that A.S. had "reached maximal medical improvement" and was unable to return to her usual work without permanent work restrictions. *Id.*  Based on the American Medical Association guidelines, Dr. Rena assessed that A.S. had ten percent impairment of her whole body, and limited her to lifting, pushing and pulling no more than ten pounds. *Id.*

### C.   Initial Denial of Application, ALJ Gill's Decision, and Appellate History

A.S. filed her initial application on April 4, 2014 alleging disabling Bipolar Disorder with an onset date of December 21, 2013. *Id.* at 380, 382.  Her application was denied on July 28, 2014. *Id.* at 235.  She filed for reconsideration, which was denied on October 23, 2014. *Id.* at 243.  On June 21, 2016, a hearing was held before ALJ Kevin Gill, who heard testimony from A.S., her attorney, and a vocational expert. *Id.* at 95.  ALJ Gill issued an unfavorable decision on October 21, 2016. *Id.* at 221.  ALJ Gill found that A.S. had engaged in substantial gainful activity from October 2014 to November 2015, and that there was no continuous twelve-month period during which A.S. had not engaged in substantial gainful activity. *Id.* at 220–21.  Based on these

---

[4] The duration of the stretch breaks prescribed by Dr. Bell is difficult to read, but appears to be either eight or fifteen minutes.  AR at 1434.

1    findings, ALJ Gill determined that A.S. was not disabled. *Id.* Because ALJ Gill based his

2    decision solely on A.S.'s employment, he did not address her impairments. *See id.* at 218–21.

3       A.S.'s case was reviewed by the Appeals Council, which vacated the hearing decision and

4    remanded the case for further proceedings. *Id.* at 230–32. The Appeals Council found that ALJ

5    Gill had erroneously required A.S. to demonstrate a twelve-month period without substantial

6    gainful activity prior to the date of the decision, and explained the regulations included no such

7    requirement. *Id.* The Appeals Council also found that ALJ Gill had failed to evaluate whether

8    A.S.'s work other than Whole Foods constituted substantial gainful activity or an unsuccessful

9    work attempt. *Id.* at 230–31. Lastly, the Appeals Council found that ALJ Gill did not evaluate

10   A.S.'s request to amend her alleged onset date from December 21, 2013 to November 4, 2012 and

11   erroneously indicated that A.S. was only insured through March 31, 2016. *Id.* at 231.

12   Accordingly, the Appeals Council remanded the case for further proceedings with explicit

13   instructions for the ALJ:

14      Evaluate the claimant's request to amend the alleged onset date and
        reevaluate the date last insured.

15

16      Further consider the claimant's earnings and the issue of substantial
        gainful activity during the entire period at issue.

17      Evaluate the claimant's alleged symptoms and provide rationale in
        accordance with the disability regulations pertaining to evaluation of

18      symptoms.

19      Give consideration to the treating and nontreating source opinions . . .
        and explain the weight given to such opinion evidence . . . .

20

21      Evaluate the claimant's maximum residual functional capacity and
        provide appropriate rational with specific references to evidence of

22      record in support of the assessed limitations . . . .

23      If warranted by the expanded record, obtain evidence from a
        vocational expert to clarify the effect of the assessed limitations on

24      the claimant's occupational base . . . .

25   *Id.* at 231–32 (internal punctuation and citations omitted).

26   **D.    Second Administrative Hearing**

27      On December 4, 2018, A.S. attended a remand hearing with counsel before ALJ

28   Evangelina Hernandez, who heard testimony from A.S., A.S.'s representatives, and a vocational

expert.  *Id.* at 24.  A.S.'s counsel stated that they were amending the onset date from November 1, 2012 to December 1, 2012.  *Id.* at 56.

ALJ Hernandez first heard testimony from A.S. about her previous work history and any income she earned after the alleged onset date.  *Id.* at 56–62.  A.S. testified that she worked at Columbia Sportswear for three months in 2013 and then worked at Whole Foods for nine months before leaving in 2015.  *Id.* at 56–58.  She testified that she had been "getting into a lot of trouble at work" and left Whole Foods to "escape feeling demoralized again from getting terminated."  *Id.* at 58.  A.S. testified that she had received several indications from management that her termination was near and explained that she had been "having some attendance issues due to emotional problems" and "having outbursts at work, [including] inappropriate language."  *Id.*  She testified that she then worked at Berkeley Bowl for two months in 2015 until she injured her back during a slip-and-fall and was placed on Workers' Compensation.  *Id.* at 59.  She testified that she then worked at Zachary's for one month in 2017 before leaving due to back pain and stress, *id.*, and worked briefly at Monterey Seafood where she had "an emotional outburst" and was experiencing performance problems, *id.* at 60, 65.  A.S. then testified that she was an on-call makeup artist for MAC Cosmetics before she was terminated for failing to alert security that a friend of hers had used counterfeit money.  *Id.* at 60–62.  A.S. testified that she had failed to report the counterfeit money because the friend had previously assaulted her, and she was terrified of being assaulted again.  *Id.* at 61.  A.S. testified that she had worked at Sonic for three months before she was terminated in October 2018 due to "friction with [her] other coworkers and supervisors."  *Id.* at 65.  A.S. explained that she had been formally disciplined at Sonic because she had an outburst after a declined work request:

> And I had asked the dispatcher if it was okay if I do Oakland and he said, no, and it resulted into me yelling and screaming over the radio. And then the shift was over, I came back to yell and scream at him some more.

*Id.* at 65–66.  A.S. explained that she often has conflicts with coworkers which usually begin after an outburst.  *Id.* at 66.  Lastly, A.S. testified that she had been working thirty-hour weeks at Craft and had been there for thirty days.  *Id.* at 85.

11

A.S. then discussed her Bipolar Disorder diagnosis and explained that she experienced episodes of mania and severe depression. *Id.* at 62–63. During a manic episode, she had difficulty focusing at work and would be "[k]ind of hard to control." *Id.* at 62. She testified that she would experience a severe depressive episode "seven days total a month" and would "wake up for work late and then get in trouble for not being on time to work." *Id.* at 63. A.S. testified that she had been written up for attendance issues "at least once from every job." *Id.* at 76. She explained that she had a history of suicidal threats and self-mutilation with a razor blade during severe depressive episodes. *Id.* at 63–64. She testified that the last time she had felt "really suicidal" was after she had been terminated from Sonic in October of that year. *Id.* at 65. A.S. also testified that her relationships with people are generally "short" because it is "hard to maintain relationship when you have bipolar disorder." *Id.* at 75. She testified that she "fight[s] with people" and gets into verbal arguments "[m]aybe once or twice a week." *Id.* ALJ Hernandez asked about A.S.'s boyfriend, and A.S. testified that they get along because "[h]is mom has schizophrenia and maybe some bipolar disorder, so he is able to handle the roller coast ride." *Id.* at 77.

ALJ Hernandez asked A.S. whether she took any medication for her Bipolar Disorder, *id.* at 65, and A.S. testified that she was not currently on medication and had not taken medication for four years, *id.* at 67. When ALJ Hernandez asked A.S. why she was not taking medication, A.S. explained as follows:

> A:  Because when -- it's like acknowledging this terrible thing that I have. And of course when I'm manic and feeling good, I don't want to take my medication because I feel like I don't need it. And going to the bipolar support group, I would listen to, you know, stories of people who their doctors would just prescribe something and it didn't work out for them. And people would often use the term of feeling numb and it kind of, it just scares me.
>
> Q:  So how long have you -- were you ever on medication?
>
> A:  I was.
>
> Q:  For how long?
>
> A:  I want to say almost all through high school and maybe even some after that. I had just a really bad experience with the medication that I was on. I felt like it was making me worse. And I had tried Seroquel and it made me really sleepy and I just felt like I couldn't function.

*Id.*  A.S. further testified that she had severe problems with memory and concentration, including difficulty staying on task and talking too much on breaks while working at Sonic.  *Id.* at 68.

ALJ Hernandez and A.S. then discussed her physical impairments, including the fall at Berkeley Bowl that resulted in A.S.'s slipped disc.  *Id.* at 69.  A.S. testified that the pain was in her lower back and felt like something was "poking [her] really hard," which then "causes pain to shoot down [her] leg."  *Id.* at 69–70.  According to A.S., she experienced pain at a level of seven out of ten while sitting in a hard chair at the hearing, including sciatic pain "right above [her] knee."  *Id.* at 70.  A.S. explained that she has trouble walking and bending down and could only stand without moving for fifteen to twenty minutes before the pain becomes worse.  *Id.* at 71–72.  A.S. testified that she takes "CBD tinctures" and Ibuprofen and uses a TENS unit to manage the pain.  *Id.* at 69–70, 73.  She explained that CBD is "the medicinal compound found in marijuana" and does not produce the "high feeling."  *Id.*  A.S. testified that she was not prescribed and does not take stronger pain medication, like Vicodin, and that she might be allergic to Vicodin.  *Id.*  ALJ Hernandez also asked A.S. about her weight, and A.S. testified that she was 5'3" and weighed 260 pounds.  *Id.* at 74.  When asked what problems arise as a result of her weight, A.S. testified that she has difficulty exercising and suffers from foot and back pain.  *Id.* at 74–75.  ALJ Hernandez then confirmed with A.S.'s representatives that the Workers' Compensation doctor recommended that A.S. lift and pull no more than ten pounds, take five-minute stretch breaks, and alternate between standing and sitting.  *Id.* at 79.

Finally, ALJ Hernandez questioned Kelly Bartlett, the vocational expert.  ALJ Hernandez provided the first hypothetical as follows:

> Assume a person of the claimant's age, education, and work experience, who can do light work, occasionally climb ladders, ropes, or scaffolds, occasionally stoop, occasionally crouch, has to avoid concentrated use of hazardous machinery, concentrated exposure, unprotected heights. Work would be limited to simple as defined in the DOT as SVP levels 1 and 2, repetitive tasks, needs to work in a low-stress job as defined as having only occasional decision-making, only occasional decisions in work setting, no interaction with the general public and work can be around coworkers, but only with occasional interactions with the coworkers.

*Id.* at 86.  Based on that hypothetical, Bartlett opined that the person described could not do A.S.'s

United States District Court
Northern District of California

past work but could perform other jobs that existed in the national economy. *Id.*

In the second hypothetical, ALJ Hernandez added mental health limitations: "absent three days a month, unexcused, unscheduled due to her mental condition." *Id.* at 88. Bartlett testified that there would be no jobs the hypothetical person could perform. *Id.* A.S.'s counsel then asked how much an individual could be off task and employable, and Bartlett testified that "employers will typically tolerate up to 10 percent." *Id.* at 89. A.S.'s counsel asked how many times an individual could have an "inappropriate incident," like insubordination or offensive language, and remain employable. *Id.* at 89–90. Bartlett testified that, generally speaking, inappropriate behavior is not tolerated and an employee who "occasionally ha[s] difficulty interacting with the supervisor" would not be employable given the number of applicants and high turnover in the unskilled labor market. *Id.*

Finally, ALJ Hernandez asked A.S. if she had any problems with alcohol or non-prescription drugs. *Id.* at 88. A.S. testified that she did not. *Id.* ALJ Hernandez then asked A.S. about her marijuana usage and A.S. testified that she smokes marijuana every day for sleep aid and back pain. *Id.* at 88–89. A.S. also confirmed that her doctor was aware that she smoked marijuana every day. *Id.* at 89.

During closing arguments, ALJ Hernandez and A.S.'s representative had the following exchange about A.S.'s decision to not take medication for her Bipolar Disorder:

> REP-2: The symptoms of her mental disorder may constitute good reasons for not adhering to her treatment, as does the lack of financial resources or another reason that may be reasonably justified . . . .
>
> ALJ: But she doesn't have any financial reasons for not taking medication for her mental illness. She just doesn't want to.
>
> REP-2: Well, it's not exactly -- it's not exactly --
>
> ALJ: Well, that's what she testified to.

*Id.* at 92–93. When A.S.'s counsel began to argue about the materiality of A.S.'s marijuana usage, ALJ Hernandez responded, "that doesn't matter . . . . [i]t doesn't matter, the ruling." *Id.* at 93.

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**E.    Legal Background for Determination of Disability**

   **1.    Five Step Framework for ALJ Decisions**

When a claimant alleges a disability and applies for Social Security benefits, the ALJ evaluates their claim using a five-step process. 20 C.F.R. § 404.1520(a)(4). At step one, if the claimant has engaged in "substantial gainful activity" during the alleged period of disability, they are not disabled. 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant has not engaged in such activities, the evaluation continues at step two.

At the second step of the analysis, if the claimant has no "severe medically determinable impairment," they are not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). Impairments are severe when there is "more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, they are not disabled; if they have a severe impairment, the evaluation continues to step three.

Next, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's alleged impairment meets or medically equals the definition of a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If not, the evaluation proceeds to step four.

At step four, if—based on the claimant's residual functional capacity ("RFC")—the claimant can still perform their past work, they are not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1520(a)(1). If the ALJ finds the claimant can perform their past relevant work, they are not disabled; if they are not able to perform such work, the evaluation moves to step five.

For the fifth and final step, the burden shifts from the claimant to prove disability to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).

1   If the Commissioner can identify work that the claimant could perform, they are not disabled; if

2   not, the claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

3        **2.**       **Supplemental Regulations for Determining Mental Disability**

4          The Social Security Administration has supplemented the five-step general disability

5   evaluation process with regulations governing the evaluation of mental impairments at steps two

6   and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a;[5] *see also Segura v.*

7   *Berryhill*, CV 17-07303-RAO, 2018 WL 5255317, at *12 (C.D. Cal. Oct. 19, 2018) (citing *Maier*

8   *v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)).  First, the Commissioner must

9   determine whether the claimant has a medically determinable mental impairment.  20 C.F.R.

10  § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation

11  resulting from the claimant's mental impairment with respect to four broad functional areas:

12  (1) ability to understand, remember, or apply information; (2) ability to interact with others;

13  (3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself.  20

14  C.F.R. § 404.1529a(b)(2), (c).  Finally, the Commissioner must determine the severity of the

15  claimant's mental impairment and whether that severity meets or equals the severity of a mental

16  impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that

17  the severity of the claimant's mental impairments meets or equals the severity of a listed mental

18  impairment, the claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the

19  evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R.

20  § 404.1520a(d)(3).

21         Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

22  presence of various listed mental impairments, but all listed mental impairments share certain

23  "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

24  criteria).  *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [5] The amendments to the regulations and listings pertaining to mental impairments became
    effective as of January 17, 2017.  *See* 20 C.F.R. § 404.1520a.  ALJ Hernandez's decision was
    issued after the effective date, and the new listings were applied.  Since neither A.S. nor the

28  Commissioner address or dispute this application, *see generally* Pl.'s Mot. (dkt. 20); Comm'r's
    Mot. (dkt. 23), the Court applies the standards used in ALJ Hernandez's decision.

United States District Court
Northern District of California

determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

general Paragraph B criteria.  To satisfy the Paragraph B criteria, one's mental disorder must result

in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental

functioning.  *See id.*  A "marked" limitation is one that is "more than moderate but less than

extreme" and "may arise when several activities or functions are impaired, or even when only one

is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's]

ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.* at

12.00C.

This evaluation process is to be used at the second and third steps of the sequential

evaluation discussed above.  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July

2, 1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and

'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental

impairment(s) at steps 2 and 3 sequential evaluation process.").  If the Commissioner determines

that the claimant has one or more severe mental impairments that neither meet nor are equal to any

listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R.

§ 404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

sequential process [and] requires a more detailed assessment by itemizing various functions

contained in the broad categories found in paragraphs B and C of the adult mental disorders

listings in 12.00 of the Listing of Impairments."  SSR 96-8p, 1996 WL 374184 at *4.[6]

### 3.      Additional Step Addressing Substance Use Disorder

Even if a claimant is determined to be disabled pursuant to this five-step process, a

---

[6] SSRs, according to the governing regulations, "are binding on all components of the Social Security Administration" and "represent precedent[ial] final opinions and orders and statements of policy and interpretations" of the Social Security Administration ("SSA").  20 C.F.R. § 402.35(b)(1); *see also Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of SSRs).  "SSRs reflect the official interpretation of the SSA and are entitled to 'some deference as long as they are consistent with the Social Security Act and regulations.'"  *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)).  SSRs do not carry the "force of law," but they are binding on the ALJs nonetheless. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

United States District Court
Northern District of California

1    claimant is not eligible for Social Security benefits if "drug addiction or alcoholism is a

2    contributing factor material to the determination of disability." 20 C.F.R. § 416.935(a). The "key

3    factor" in making this determination is whether the claimant would still be disabled if the claimant

4    stopped using drugs or alcohol. 20 C.F.R. § 416.935(b)(1). The claimant's drug or alcohol use is

5    only a material contributing factor to the determination of disability if the remaining limitations

6    would not be disabling. *Id.* § 416.935(b)(3).

7        **F.    ALJ Hernandez's Decision**

8        In her decision issued April 16, 2019, ALJ Hernandez considered whether A.S. was

9    disabled within the meaning of the Social Security Act and whether the insured status

10   requirements of the Social Security Act were met. AR at 24–39. ALJ Hernandez first determined

11   that A.S. met the insured status requirements through March 31, 2021, *id.* at 27, and then applied

12   the five-step analysis and determined that A.S. was not disabled.

13       **1.    Step One: Substantial Gainful Activity**

14       At Step One, ALJ Hernandez determined that A.S. had engaged in periods of substantial

15   gainful activity since her amended onset date and was therefore not disabled from September to

16   December 2013, October 2014 to November 2015, and from March 2018 onwards. *Id.* at 27.

17   ALJ Hernandez found, however, that A.S. did not report income in 2016 and 2017 and therefore

18   did not engage in substantial gainful activity during that period. *Id.* at 27–28.

19       ALJ Hernandez found that from September to December 2013, A.S. earned above the

20   threshold for substantial gainful activity and therefore returned to substantial gainful activity

21   within twelve months of her amended onset date. *Id.* at 28. ALJ Hernandez rejected A.S.'s

22   argument that her 2013[7] work was an unsuccessful work attempt because she submitted no

23   medical records from that period and "no objective evidence showing she quit this work due to her

24   impairments." *Id.* ALJ Hernandez concluded that A.S. was not disabled from October 2014 to

25   November 2015 because A.S. earned above substantial gainful activity levels and Workers'

26   Compensation records stated A.S. was able to work without restrictions until her injury on

27

28   _____

     [7] Much of ALJ Hernandez's discussion of this period of work erroneously references it as
     occurring in 2012. AR at 28.

18

United States District Court
Northern District of California

November 28, 2015. *Id.* Lastly, ALJ Hernandez concluded that A.S.'s 2018 work at Craft Cannabis was above the threshold for substantial gainful activity. *Id.* at 27–28.

ALJ Hernandez found that although A.S. had reported that her "sidework as a personal chef" from 2016 and 2017 was "lucrative," she had not reported the income and therefore A.S. did not perform substantial gainful activity during this period. *Id.* at 28.

### 2.   Step Two: Severe Impairments

At Step Two, ALJ Hernandez found that A.S. suffered from five severe impairments: obesity, L5-S1 disc displacement with right lumbar radiculopathy, bipolar disorder, marijuana use disorder, and borderline personality disorder. *Id.* at 28 (citing 20 C.F.R. § 404.1520(c); 416.920(c)). ALJ Hernandez provided her reasoning for determining that obesity was a severe impairment and explained that obesity is associated with an increase in mortality. *Id.* at 28–29.

ALJ Hernandez further found that A.S. had no severe impairments from her November 4, 2012 onset date to November 28, 2015 because she had "shown only four months of treatment for non-acute conditions during this period." *Id.* at 29. Furthermore, ALJ Hernandez found that A.S.'s "medically determinable impairments did not prevent her from engaging in SGA for any consecutive 12-month period during that time." *Id.*

### 3.   Step Three: Medical Severity

ALJ Hernandez first found that "[o]pinion evidence submitted by the claimant [was] generally inconsistent with the evidence of record absent drug and alcohol abuse." *Id.* at 30. ALJ Hernandez noted reports of active marijuana use in 2014 and 2015 and periods of time when A.S. did not have a valid medical marijuana recommendation. *Id.* During the times A.S. did have medical marijuana recommendations, ALJ Hernandez found no indication that a medical professional advised A.S. to take marijuana for the specific purpose of treating her bipolar or personality disorders. *Id.* ALJ Hernandez rejected the opinion of Kari Petersen, LCSW, who wrote that A.S.'s mental disorders would be disabling in the absence of substance use because her disorders predated substance use.[8] *Id.* ALJ Hernandez pointed to a report that A.S. had begun

_____

[8] In her decision, ALJ Hernandez states that Kari Petersen, LCSW, and Nurse Practitioner Kevin Lagor assessed that A.S.'s "*substance use disorder* would be disabling in the absence of substance

United States District Court
Northern District of California

1    using marijuana at age fifteen and concluded that Ms. Petersen's assessment of a disabling

2    personality disorder even absent substance use was inconsistent with A.S.'s engagement in

3    substantial gainful activity in 2011, 2015, and 2018.  *Id.* at 31.  ALJ Hernandez rejected the

4    medical opinion of Dr. Roslyn Wright, Psy.D., who assessed that there was "no evidence that

5    [A.S.'s] functioning deteriorates in response to her use of cannabis," and concluded Dr. Wright's

6    opinion was based on A.S.'s representation that she was prescribed medical marijuana for mental

7    health treatment.  *Id.* (internal quotation marks omitted).  ALJ Hernandez instead relies on the

8    medical opinion of Dr. Lesleigh Franklin, Ph.D., who assessed that A.S.'s "substance abuse

9    contributes to her limitations."[9]  *Id.* at 30.

10         ALJ Hernandez concluded that A.S.'s "mental impairments, including the substance use

11   disorders, cause at least one extreme limitation or two marked limitations, the paragraph B criteria

12   are satisfied."  *Id.*  Absent the substance use, A.S.'s mental impairments "would not cause at least

13   one extreme limitation or two marked limitations," and therefore would not satisfy paragraph B.

14   *Id.* at 34.  Judge Hernandez found that, absent substance use, A.S. would only have one "marked

15   limitation" in interacting with others and "moderate limitation" in adapting or managing herself.

16   *Id.*

17              **4.      Step Four: Residual Functional Capacity**

18         ALJ Hernandez found that if A.S. stopped substance use, she would have the residual

19   functional capacity to:

20              perform sedentary work as defined in 20 CFR 404.1567(a) and
             416.967(a) except: occasionally climb ladders, ropes, and scaffolds;
21              occasionally stoop; occasionally crouch; has to avoid concentrated
             use of hazardous machinery and avoid concentrated exposure to
22              unprotected heights; work would be limited to simple as defined in
             the D.O.T. as SVP levels one and two, routine and repetitive, needs
23              to work in a low stress job defined as having only occasional decision-
             making and changes in the work setting; no interaction with the

24

25   _____

26   use because it 'appears to have started before she started using any drugs.'" AR at 31 (emphasis
     added).  This appears to be an error—ALJ Hernandez presumably intended to refer to A.S.'s
27   mental impairments generally rather than her "substance use disorder."
     [9] ALJ Hernandez omits that Dr. Franklin's only assessment of A.S.'s limitations from substance
28   use was the impact on her memory.  AR at 1208.  Dr. Franklin further states her belief that A.S.
     would reduce her substance use if she began taking prescription medication.  *Id.*

United States District Court
Northern District of California

> general public; work can be around co-workers throughout the day,
> but only with occasional interaction with co-workers.

*Id.* at 35.

ALJ Hernandez found A.S.'s allegations of problems with interpersonal relationships were inconsistent with the medical record because A.S. testified she had a boyfriend and "minimal engagement in treatment punctuated by periods of substantial gainful activity." *Id.* at 36. ALJ Hernandez noted that A.S. is "consistently advised of the likely benefits of psychotropic medications but is noncompliant with those recommendations." *Id.* ALJ Hernandez rejected A.S.'s allegations of "weeklong prostrating back pain" because A.S. "takes only ibuprofen and CBD oils," is able to drive, and does not allege significant limitations performing sedentary work. *Id.*

ALJ Hernandez made the following assessment of the consistency of A.S.'s testimony with regards to the evidentiary record:

> If claimant stopped the substance use, I find that claimant's medically
> determinable impairments could reasonably be expected to produce
> the alleged symptoms; however, claimant's statements concerning the
> intensity, persistence, and limiting effects of these symptoms are not
> entirely consistent with the objective medical and other evidence . . . .

*Id.* ALJ Hernandez found "the evidence of the record is inconsistent with severe impairment and shows claimant is disabled when she is actively using marijuana." *Id.* ALJ Hernandez found A.S. was performing substantial gainful activity until she injured her back at work. *Id.* ALJ Hernandez concluded that Workers' Compensation records were the "only statements of physical limitations contained in the medical evidence of record" and that A.S. was capable of performing sedentary work with limitations. *Id.* at 37.

ALJ Hernandez assessed the opinions of the medical experts as follows:

> As for the opinion evidence, I find the sedentary work restrictions
> contained in claimant's Workers' Compensation records most
> persuasive. During periods of abstinence, I find the opinions of Drs.
> Van Gaasbeek, Brode, and Lucilia most persuasive . . . . When
> claimant is actively abusing marijuana, . . . I find the opinions if Dr.
> Franklin most persuasive and those of Ms. Petersen, NP Lagor, and
> Drs. Kennedy, Wiebe, and Wright persuasive.

*Id.* (internal citations omitted).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

     **5.**      **Step Five: Ability to Perform Other Jobs in the National Economy**

     ALJ Hernandez then addressed the hearing testimony of the vocational expert Kelly Bartlett.  *Id.*  Based on that testimony, ALJ Hernandez found that "if claimant stopped the substance use, she would be capable of making a successful adjustment to work that exists in significant numbers in the national economy." *Id.* at 39.  ALJ Hernandez concluded that A.S.'s "substance use disorder is a contributing factor material to the determination of disability because claimant would not be disabled if she stopped the substance use" and concluded A.S. was not disabled at any time from her alleged onset date to the date of the decision.  *Id.*

    **G.**    **The Parties' Arguments**

     **1.**     **A.S.'s Motion for Summary Judgment**

     In her motion for summary judgment, A.S. argues that she is entitled to benefits from onset, December 1, 2012 to the end of her reentitlement period, August 31, 2018,[10] and requests remand for award of benefits.  Pl.'s Mot. (dkt. 20) at 16, 25.  First, A.S. argues that ALJ Hernandez erred in finding A.S. had engaged in substantial gainful employment from September to December 2013, October 2014 to November 2015, and March 2018 to present.  *Id.* at 5–16.  A.S. asserts that her "work history seems robust, but in reality . . . is a pattern" of unsuccessful work attempts and trial work period earnings, and as such, are excluded from the definition of substantial gainful activity.  *Id.* at 6.  A.S. argues that her Workers' Compensation records indicating no previous impairments were limited to her physical condition, not her mental condition.  *Id.* at 13.  A.S. further argues that ALJ Hernandez faulted her for failing to seek treatment and that a "gap in treatment does not mean her mental health issues disappeared."  *Id.* at 15.

     Second, A.S. argues that ALJ Hernandez erred in her step-two inquiry by finding A.S. had

---

[10] A claimant may test their ability to work during a nine-month period without losing their disability status or benefits.  20 C.F.R. § 404.1592.  After the trial work period, a claimant may continue to test their ability to work during a thirty-six month "reentitlement period," *see* 20 C.F.R. § 404.1529a, which A.S. also refers to as an "extended period of eligibility," Pl.'s Mot. at 10 (heading capitalization altered).  Unlike the trial work period, if a beneficiary works during the reentitlement period, the Commissioner may decide that the disability has ceased because the beneficiary is engaged in substantial gainful activity.  *Id.* § 404.1529a(a).

no severe impairments from her amended onset date through November 28, 2015.  *Id.* at 16.  A.S. asserts that she provided medical records from that period addressing her Bipolar I Disorder, Generalized Anxiety Disorder, Bipolar II Disorder, Eating Disorder, PTSD, Major Depressive Disorder, and Mood Disorder.  *Id.* at 17.

Third, A.S. argues that ALJ Hernandez erred in evaluating the medical evidence by failing to properly credit the opinion of her treating sources and instead relying on the testimony of non-treating examiners, *id.* at 18, erroneously concluding that lack of treatment shows lack of disability, *id.* at 21, and rejecting A.S.'s testimony about the severity of her symptoms without affirmative evidence of malingering, *id.* at 22–23.

Lastly, A.S. argues that ALJ Hernandez erred in concluding A.S.'s marijuana use was the cause of her disability.  *Id.* at 23.  A.S. asserts that ALJ Hernandez "erroneously substitute[d] her lay opinion in lieu of that of a medical expert."  *Id.*  A.S. argues that ALJ Hernandez dismissed the issue of materiality when the hearing would have been the "proper forum to discuss the issue or raise concerns."  *Id.*  Accordingly, A.S. asks the Court to credit the medical opinion evidence and A.S.'s testimony as true and remand for an award of benefits.  *Id.* at 24–25 (citing *Harman v. Apfel*, 211 F.3d 1172 (9th Cir. 1981)).

## 2.     The Commissioner's Motion for Summary Judgment

The Commissioner argues that ALJ Hernandez's decision is supported by substantial evidence and is free of legal error.  *See generally* Comm'r's Mot. (dkt. 23).  The Commissioner contends that ALJ Hernandez correctly found that A.S.'s work history was substantial gainful activity.  *Id.* at 2.  The Commissioner argues that A.S.'s earnings exceeded the earnings levels for substantial gainful activity, *id.* at 3, and that she failed to satisfy the requirements for an unsuccessful work attempt, including failing to demonstrate a "significant break" in employment prior to the work and that "work stopped as a direct result of her impairment."  *Id.* at 2–3.

As to the step-two finding, the Commissioner argues that, contrary to A.S.'s contention, ALJ Hernandez is not required to "rule piecemeal on the severity of each alleged impairment."  *Id.* at 5.  The Commissioner further argues that any alleged error would not have affected the ultimate disability determination and is therefore "harmless as a matter of law."  *Id.* at 6.

United States District Court
Northern District of California

1    The Commissioner argues that ALJ Hernandez's consideration of the medical evidence is

2    supported by substantial evidence and that A.S.'s "alternative interpretation" of the evidence is

3    insufficient to overturn the decision.  *Id.* at 7–8.  The Commissioner argues that A.S. never

4    stopped her substance use and therefore, "there is no real evidence of how she would function

5    absent this substance abuse."  *Id.* at 7.  Lastly, the Commissioner argues that ALJ Hernandez

6    correctly concluded that A.S. would not be disabled if she stopped her substance use, *id.* at 9, and

7    that the decision was "free from reversible legal error."  *Id.*  Accordingly, the Commissioner asks

8    the Court to affirm the decision or, if error is found, to remand for further administrative

9    proceedings.  *Id.*

10                       **3.      A.S.'s Reply**

11   A.S. largely reiterates the arguments from her motion in her reply brief.  *See generally*

12   Reply (dkt. 24).  She argues that her work history was "a string of sequential, short term jobs"

13   which only last as long as her manic episodes and does not constitute substantial gainful activity.

14   *Id.* at 6–7 (citing *Gatliff v. Commissioner*, 172 F.3d 690 (9th Cir. 1999)).  A.S. rejects the

15   Commissioner's argument that any error in evaluating step-two severity was harmless because she

16   contends it impacted the determination of her residual functional capacity and the job base at step-

17   five.  *Id.* at 7–8.

18   A.S. argues that she is not required to be substance-free to prove disability.  *Id.* at 8.  She

19   contends that, contrary to the Commissioner's arguments, the medical record demonstrates her

20   mental impairments predate her marijuana usage.  *Id.* at 8.  Lastly, A.S. argues that she does not

21   merely proffer her own interpretation of the evidence because she contends that ALJ Hernandez

22   failed to meet the substantial evidence standard by improperly crediting non-treating examiners

23   over treating examiners.  *Id.* at 9–10.  A.S. asks the Court to award benefits for the period of

24   December 1, 2012 to April 16, 2019.  *Id.* at 10.

25   **III.    ANALYSIS**

26       **A.    Legal Standard**

27   District courts have jurisdiction to review the final decisions of the Commissioner and may

28   affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

1    hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

2         When reviewing the Commissioner's decision, the Court takes as conclusive any findings

3    of the Commissioner that are free of legal error and supported by "substantial evidence."

4    Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

5    conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401

6    (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a

7    preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

8    1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial

9    evidence, the decision should be set aside if proper legal standards were not applied when

10   weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v.*

11   *Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider

12   both the evidence that supports and the evidence that detracts from the Commissioner's

13   conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

14   F.2d 993, 995 (9th Cir. 1985)).

15        If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

16   the Court may remand for further proceedings or for a calculation of benefits.  *See Garrison v.*

17   *Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

18        **B.    Whether the ALJ Erred in Not Evaluating the Amended Onset Date**

19        During the hearing before ALJ Hernandez, A.S. requested to amend her onset date from

20   November 4, 2012 to December 1, 2012.  AR at 56.  In her decision, ALJ Hernandez did not

21   address A.S.'s request to amend her onset date and instead applied the November 4, 2012 date,

22   despite the Appeals Council's admonishment of the previous ALJ for failure to consider an earlier

23   request to amend the onset date.  *See id.* at 231.

24        The Ninth Circuit has recognized that the "onset date of a disability can be critical to an

25   individual's application for disability benefits."  *Wellington v. Berryhill*, 878 F.3d 867, 872 (9th

26   Cir. 2017).  The determination of the date of onset begins with the date provided in the claimant's

27   disability application. SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983).  "Medical reports

28   containing descriptions of examinations or treatment of the individual are basic to the

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1    determination of the onset of disability." *Id.* at *2.  The claimant's chosen date "should be used if

2    it is consistent with all the evidence available." *Id.* at *3.  Ultimately, "[t]he ALJ is responsible

3    for studying the record and resolving any conflicts of ambiguities in it." *Diedrich v. Berryhill*, 874

4    F.3d 634, 638 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090,

5    1098 (9th Cir. 2014)).  Upon remand, the ALJ should determine whether A.S.'s request to amend

6    her onset date to December 1, 2012 is supported by the evidence in the record.

7        **C.    Whether the ALJ Erred in Assessing Substantial Gainful Activity**

8            A.S. argues that ALJ Hernandez erred in finding that she engaged in substantial gainful

9    activity because the work at issue was either during her trial work period and reentitlement period

10   or unsuccessful work attempts.  A.S. contends that although her work history is robust, she is only

11   able to obtain and sustain employment during manic periods.  She argues that her September to

12   December 2013 work at Columbia Sportswear was an unsuccessful work attempt; her October

13   2014 to September 2015 work at Whole Foods was during her trial work period and reentitlement

14   period; her November 2015 work at Berkeley Bowl was during her reentitlement period; her

15   March to May 2018 work at Orton Entertainment was an unsuccessful work attempt; and her June

16   to October 2018 work at Sonic was an unsuccessful work attempt.  Pl.'s Mot. at 5–15.

17       **1.    Trial Work Period and Reentitlement Period**

18           Before the Commissioner determines that an individual is no longer disabled because he or

19   she is engaged in substantial gainful activity, the Commissioner first considers whether the

20   individual is entitled to a "trial work period."  20 C.F.R. § 404.1594(d)(5).  A trial work period is a

21   period of nine months—which need not be consecutive—in which an individual may test their

22   ability to work and still be considered disabled.  *Id.* § 404.1592(a).  After the nine-month trial

23   work period, the individual may continue to test their ability to work in a thirty-six month

24   "reentitlement period."  *See id.* § 404.1592a.

25           Unlike the trial work period, the Commissioner may decide that the disability has ceased

26   because the beneficiary is engaged in substantial gainful activity during the reentitlement period.

27   *Id.* § 404.1592a(a).  The regulations provide that "[t]he first time you work after the end of your

28   trial work period and engage in substantial gainful activity, we will find your disability has

26

ceased." *Id.* § 404.1529(a)(1).  This first time in which the individual works after the trial period and in the reentitlement period, the Commissioner considers all relevant factors to determine whether the work is substantial gainful activity, including "unsuccessful work attempts." *Id.*  If the Commissioner determines that the individual's disability has ceased during the reentitlement period because he or she engaged in substantial gainful activity, the Commissioner will pay benefits for the first month after the trial work period in which the individual engaged in substantial gainful activity and for two succeeding months, whether or not the individual performed substantial gainful activity in those two months.  *Id.* § 404.1592a(a)(2)(i).  After those three months, however, the Commissioner stops paying benefits in the reentitlement period "for any month in which you do substantial gainful activity." *Id.*  After benefits are stopped because of an individual's substantial gainful activity, they may be started again—without a new application and a new determination of disability—if the individual stops engaging in substantial gainful activity in any month during the reentitlement period.  20 C.F.R. § 404.1529a(a)(2)(i).

### 2.    Unsuccessful Work Attempt

Work lasting less than six months may be an unsuccessful work attempt if: (1) there was a significant break before that work and (2) the work stopped (or reduced to a level below substantial gainful activity) "because of the special conditions that took into account your impairment and permitted you to work."  20 C.F.R. § 404.1574(c).  Under SSR 84-25, a significant break occurs "if the person (1) was out of work for at least 30 consecutive days or (2) was forced to change to another type of work or another employer."  SSR 84-25, 1984 WL 49799, at *7 (Jan. 1, 1984).

### 3.    The ALJ Erred in Failing to Analyze A.S.'s Employment

ALJ Hernandez only considered whether A.S.'s 2013 employment (which ALJ Hernandez in some instances erroneously cited as occurring in 2012) was an unsuccessful work attempt, and based her conclusion not on the nature of the work, but on a purported lack of evidence of a severe impairment—an issue better addressed at Step Two.  AR at 28.  ALJ Hernandez did not consider whether A.S.'s other periods of employment were unsuccessful work attempts or performed during her trial work period and reentitlement period.  Instead, ALJ Hernandez ended her analysis

27

1    after concluding that A.S.'s employment exceeded substantial gainful activity levels.  *Id.* at 27–28.

2    However, "[t]he mere existence of earnings over the statutory minimum is not dispositive."  *Keyes*

3    *v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990) (citations omitted).

4           ALJ Hernandez should have considered whether the employment qualified as trial work

5    period earnings, whether it fell within a reentitlement period, or whether it was an unsuccessful

6    work attempt before concluding the work constituted substantial gainful activity.  *See* 20 C.F.R.

7    § 404.1594(d)(5).  The Commissioner defends the ALJ's interpretation of these periods of work

8    largely based on analysis that the ALJ did not include in her decision.  *See* Comm'r's Mot. at 3–4.

9    A district court may "review only the reasons provided by the ALJ in the disability determination

10   and may not affirm the ALJ on a ground upon which he did not rely."  *Garrison*, 759 F.3d at 1010.

11   The failure to analyze these work periods was legal error and prejudicial to A.S.'s application for

12   disability benefits.  Accordingly, upon remand, the Commissioner should analyze each period of

13   employment and apply the rules for a trial work period, a reentitlement period, and an

14   unsuccessful work attempt, as discussed above.

15         **D.    Whether the ALJ Erred in Evaluating Step Two Severity**

16          An impairment is considered severe when it significantly limits a person's "physical or

17   mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At Step Two of the

18   disability determination, "[a]n impairment or combination of impairments may be found 'not

19   severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect

20   on an individual's ability to work.'"  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005)

21   (quoting *Smolen*, 80 F.3d at 1290).  The severity determination at Step Two is a "de minimis

22   screening devise [used] to dispose of groundless claims."  *Smolen*, 80 F.3d at 1290.  "[A]n ALJ

23   may find that a claimant lacks a medically severe impairment or combination of impairments only

24   when his conclusion is 'clearly established by medical evidence.'"  *Webb*, 433 F.3d at 687 (citing

25   SSR 85-28).  In evaluating an ALJ's severity determination, the district court "must determine

26   whether the ALJ had substantial evidence to find that the medical evidence clearly established that

27   [the claimant] did not have a medically severe impairment or combination of impairments."  *Id.*

28          ALJ Hernandez concluded that A.S. had no severe impairments from her amended onset

United States District Court
Northern District of California

date through November 28, 2015 because she provided no evidence of medical treatment until March of 2014.  AR at 29.   The Ninth Circuit has "criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for exercise of poor judgment in seeking rehabilitation.'"  *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).  The regulations further provide that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  SSR 96-7, 1996 SSR WL 374186, at *7 (July 2, 1996).  In the case of mental illness, a failure to seek treatment or take prescribed medication may often be indicative of a more severe mental impairment.  *See Nguyen*, 100 F.3d at 1465.

Here, ALJ Hernandez did not discuss any factors in the record, any testimony from A.S., or any argument from her representatives that would have explained her failure to seek treatment. She did not discuss testimony from A.S. that during manic periods, she does not feel like she needs medication.  *See* AR at 67.  ALJ Hernandez did not discuss A.S.'s testimony that medication made her feel "worse," "really sleepy," and "like [she] couldn't function."  *Id.*  Nor did she address the fact that A.S. suffered from bouts of homelessness and unemployment and often could not afford medication.  AR at 92–93; *see Regennitter*, 166 F.3d at 1296 ("Although we have held that 'an unexplained, or inadequately explained failure to seek treatment can cast doubt on the sincerity of a claimant's pain testimony,' we have proscribed the rejection of a claimant's complaint for lack of treatment when the record establishes that the claimant could not afford it.") (citations, ellipses and brackets omitted).  Instead, ALJ Hernandez asserted without further explanation that A.S.'s symptoms were not severe simply because she did not seek treatment.

For the period from March of 2014 through November 28, 2015, ALJ Hernandez discussed aspects of A.S. mental health treatment—including records of paranoid ideation, marked impairments in various functional categories, suicidal ideation, and a diagnosis of bipolar

1  disorder—but determined that A.S. had no severe impairments during that time because she

2  returned to work after four months of treatment and thereafter engaged in what ALJ Hernandez

3  determined was substantial gainful activity.  AR at 29.  As discussed above, ALJ Hernandez failed

4  to address sufficiently whether that work fell within an exception for unsuccessful work attempts,

5  trial work, or a reentitlement period.

6       Accordingly, the Court finds that ALJ Hernandez erred in her determination that A.S.'s

7  mental impairments did not satisfy the "de minimis screening" of Step 2 before November of

8  2015.  *See Smolen*, 80 F.3d at 1290.  On remand, the Commissioner shall reevaluate the severity

9  of A.S.'s impairments, including her explanations for foregoing treatment.

    **E.**    **Whether the ALJ Erred in Finding Substance Use Material to A.S.'s Impairments**

       **1.**    **Legal Standards Governing the Weight to Be Afforded Medical Opinions**

13      "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

14  who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

15  (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining

16  physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  "[T]he opinion of a treating

17  physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of

18  an examining physician is entitled to greater weight than that of a non-examining physician."

19  *Garrison v. Colvin*, 759 F.3d 993, 1012 (9th Cir. 1996)).[11]

20      "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must

21  state clear and convincing reasons that are supported by substantial evidence."  *Ryan v. Comm'r of*

22  *Soc. Sec.*, 529 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted).  "[T]he opinion of a non-

23  examining physician cannot by itself constitute substantial evidence that justifies the rejection of

24  the opinion of either an examining physician or a treating physician."  *Id.* at 1202 (quoting *Lester*,

United States District Court
Northern District of California

---

[11] The regulations governing treatment of medical evidence have been amended with respect to applications filed on or after March 27, 2017.  *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520(c).  Because A.S. filed her application before that date, the older framework applies here, and this order need not consider what effect the regulatory change has on Ninth Circuit precedent regarding the weight afforded to different categories of medical opinions.

1    81 F.3d at 831).  The Ninth Circuit has emphasized the high standard required for an ALJ to reject

2    an opinion from a treating or examining doctor, even where the record includes a contradictory

3    medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another
> doctor's opinion, an ALJ may only reject it by providing specific and
> legitimate reasons that are supported by substantial evidence." [*Ryan*,
> 528 F.3d at 1198.].  This is so because, even when contradicted, a
> treating or examining physician's opinion is still owed deference and
> will often be "entitled to the greatest weight . . . even if it does not
> meet the test for controlling weight."  *Orn v. Astrue*, 495 F.3d 625,
> 633 (9th Cir. 2007).  An ALJ can satisfy the "substantial evidence"
> requirement by setting out a detailed and thorough summary of the
> facts and conflicting clinical evidence, stating his interpretation
> thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725
> (9th Cir. 1998)].  "The ALJ must do more than state conclusions.  He
> must set forth his own interpretations and explain why they, rather
> than the doctors', are correct." *Id.* (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth
> specific, legitimate reasons for crediting one medical opinion over
> another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir.
> 1996).  In other words, an ALJ errs when he rejects a medical opinion
> or assigns it little weight while doing nothing more than ignoring it,
> asserting without explanation that another medical opinion is more
> persuasive, or criticizing it with boilerplate language that fails to offer
> a substantive basis for his conclusion. *See id.*

16    *Garrison*, 759 F.3d at 1012–13 (footnote omitted).  Courts may consider only the reasons provided

17    by the ALJ in the disability determination and may not affirm the ALJ on grounds upon which the

18    ALJ did not rely.  *Id.* at 1010 (citation omitted).

19             **2.    Legal Standard for Reviewing Substance Use Materiality**

20             If an ALJ finds that the claimant is disabled and there is medical evidence of drug

21    addiction or alcoholism, the ALJ must determine whether the "drug addiction or alcoholism is a

22    contributing factor material to the determination of disability."  20 C.F.R. § 416.935(a).  The key

23    factor in making this determination is whether the claimant would still be found disabled if he

24    stopped using the drug or alcohol.  *Id.* § 416.935(b)(1).  The claimant's drug or alcohol addiction

25    ("DAA") is only a material contributing factor to the determination of disability if the remaining

26    limitations would not be disabling.  *Id.* § 416.935(b)(3).

27             SSR 13-2p sets forth the standard for determining when DAA is material to a claimant's

28    mental impairment:

1

*7.   What do we do if the claimant's co-occurring mental disorder(s) improve in the absence of DAA?*

2

a.   Many people with DAA have co-occurring mental disorders; that is, a mental disorder(s) diagnosed by an acceptable medical source in addition to their DAA. We do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol.

3

4

5

6

b.   To support a finding that DAA is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA. Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder.

7

8

9

c.   We may purchase a CE in a case involving a co-occurring mental disorder(s). We will purchase CEs primarily to help establish whether a claimant who has no treating source records has a mental disorder(s) in addition to DAA. See Question 8. We will provide a copy of this evidence, or a summary, to the CE provider.

10

11

12

d.   We will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA.

13

14

15

16     SSR 13-2p, 2013 WL 621536, at *9 (Feb. 20, 2013).

17          "[T]he claimant bears the burden of proving that drug or alcohol addiction is not a

18     contributing factor material to his disability." *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007).

19     In *Parra*, the Ninth Circuit found that the plaintiff failed to carry his burden because "[t]he record

20     offered no evidence supporting the notion that the disabling effects of [the plaintiff]'s cirrhosis

21     would have remained had he stopped drinking," and his physician had stated that cirrhosis was

22     generally reversible. *Id.*  On the other hand, "there does not have to be evidence from a period of

23     abstinence for the claimant to meet his or her burden of proving disability."  SSR 13-2p, 2013 WL

24     621536 at *4.  Instead, the determination of whether a claimant's drug or alcohol use is material to

25     disability is based on consideration of "the evidence as a whole, both medical and nonmedical."

26     *Id.*

27          **3.       The ALJ Erred in Conducting the DAA Materiality Analysis**

28          The Court concludes that ALJ Hernandez committed legal error in her DAA analysis.

United States District Court
Northern District of California

32

1    First, ALJ Hernandez's failure to apply the standard set forth in SSR 13-2p for determining the

2    materiality of DAA in the case of mental impairment was legal error and prejudicial.  *See id.* at *9.

3    Second, ALJ Hernandez's conclusion that A.S.'s impairments would improve to the point of

4    nondisability in the absence of DAA is not supported by substantial evidence.

5          The medical evidence in the record on the question whether DAA is material to A.S.'s

6    functional limitations is largely consistent, with treatment providers, examining doctors, and

7    nonexamining doctors alike agreeing that her symptoms in connection with her mental

8    impairments are not caused by her marijuana usage and that even in the absence of such use she

9    would have significant deficits in her ability to function.  In fact, no treating or examining

10   provider expressed the opinion that A.S.'s impairments would diminish in the absence of

11   substance use.  To the contrary, LCSW Petersen, NP Lagor, and Drs. Wiebe, Wright, and Franklin

12   all stated the opposite.  *See* AR at 1347 (LCSW Petersen), 1440 (LCSW Petersen and NP Lagor),

13   1362 (Dr. Wiebe), 1816 (Dr. Wright), 1207–08 (Dr. Franklin).  Even the Commissioner appears to

14   concede this point in his motion, arguing that "there is no evidence of how she would function

15   absent this substance use."  Comm'r's Mot. at 31.  The only medical opinion cited by ALJ

16   Hernandez is Dr. Franklin's conclusion that A.S.'s "substance use contributes to her limitations."

17   AR at 30.  ALJ Hernandez, however, omits Dr. Franklin's explanation that A.S.'s substance use

18   specifically affects her memory.  *Id.* at 1207–08.  Dr. Franklin did not assess that A.S.'s

19   impairments would cease to exist if she stopped her substance use.  *See id.*  Regardless, SSR 13-2p

20   does "not permit adjudicators to rely exclusively on medical expertise and the nature of a

21   claimant's mental disorder."  SSR 13-2p, 2013 WL 621536, at *9.

22         There is ample evidence in the medical record indicating that DAA is not material to

23   A.S.'s mental impairments, and the ALJ cites no "evidence in the case record that establishes that

24   a claimant with a co-occurring mental disorder(s) would *not* be disabled in the absence of DAA,"

25   as required by the SSR.  *See* SSR 13-2p (emphasis added).

26         Accordingly, the Court concludes that ALJ Hernandez committed legal error and that her

27   conclusion that A.S.'s substance use was material to her disability was not supported by

28   substantial evidence.

United States District Court
Northern District of California

**F.     Whether the Court Should Remand for Further Administrative Proceedings**

A.S. requests that her case be remanded for an award of benefits based on the credit-as-true

rule or in the alternative, remanded for further administrative proceedings.

Once a district court has determined that an ALJ has erred, the court must decide whether

to remand for further proceedings or to remand for immediate award of benefits.  *Harman v. Apfel*,

211 F.3d 1172, 1177–78 (9th Cir. 2000).  If an ALJ has improperly failed to credit medical

opinion evidence, a district court must credit that testimony as true and remand for an award of

benefits provided that three conditions are satisfied:

> (1) the record has been fully developed and further administrative
> proceedings would serve no useful purpose; (2) the ALJ has failed to
> provide legally sufficient reasons for rejecting evidence, whether
> claimant testimony or medical opinion; and (3) the improperly
> discredited evidence were credited as true, the ALJ would be required
> to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020.  Under such circumstances, a court should not remand for further

administrative proceedings to reassess credibility.  *See id.* at 1019–21.  This "credit as true" rule is

"settled" in the Ninth Circuit and is intended to encourage careful analysis by ALJs, avoid

duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of

whom "suffer from painful and debilitating conditions, as well as severe economic hardship."  *Id.*

at 999, 1019 (quoting *Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1398–99 (9th

Cir. 1988)).  A court may remand for further proceedings "when the record as a whole creates

serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social

Security Act."  *Id.* at 1021.

Here, there are ambiguities in the record that further proceedings would be useful to

reconcile.  First, the record is unclear as to A.S.'s disability onset date.  *See Dominguez v. Colvin*,

808 F.3d 403, 409 (9th Cir. 2015) (finding remand appropriate where the ALJ did not address the

claimant's request for an amended onset date).  Second, the record is insufficient to determine

whether A.S.'s periods of employment constituted substantial gainful activity.  Specifically,

whether A.S.'s periods of employment occurred during her trial work period and reentitlement

period or were unsuccessful work attempts.  Lastly, the record is insufficient to determine the

34

severity of A.S.'s impairments, including A.S.'s reasons for foregoing treatment.

Although it appears unlikely that the record in this case could support a conclusion that A.S.'s drug use was material to her mental impairments under the standard of SSR 13-2p, other ambiguities in the record remain—including the nature of A.S.'s work during her alleged period of disability and her reasons for at times foregoing treatment. It is not "clear that the ALJ would be required to find [A.S.] disabled on remand." *See Garrison*, 759 F.3d at 1020. Accordingly, the Court remands for further proceedings.

## IV.     CONCLUSION

For the foregoing reasons, A.S.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: March 22, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California